**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| ELLEN HANA ABDUR-RAHIM; | CIVIL ACTION NO.  2:22-cv-2286 |
| ELIZABETH ANDROMEDA; DUCK BARDUS; | |
| TANYA BILS; RYAN MCMULLEN; | |
| MORGEN MORRISSETTE; | |
| NICHOLAS PASQUARELLO; | |
| COLE RAMSEY; GWEN SHORT; | JUDGE |
| HELEN STEWART; and LENA TENNEY; | |
| | MAGISTRATE JUDGE |
| Plaintiffs, | |
| | |
| v. | |
| | |
| THE CITY OF COLUMBUS; THOMAS QUINLAN, | |
| in his individual and official capacities; OFFICER | |
| MATTHEW HOUSER (BADGE NUMBER 158), | |
| in his individual and official capacities; and JOHN | |
| AND JANE DOE, Nos. 1-30, in their individual and | |
| official capacities; | |
| | **JURY DEMAND ENDORSED HEREON** |
| Defendants. | |

**COMPLAINT**

### I.   INTRODUCTION

1.      On May 25, 2020, former Minnesota Police Officer Derek Chauvin, with the aid of other Officers, murdered George Floyd by kneeling on his neck for 9 minutes and 29 seconds—4 minutes and 45 seconds as Floyd cried out for help, 53 seconds as Floyd flailed due to seizures, and 3 minutes and 51 seconds as Floyd was non-responsive—setting off mass protests in Columbus and nationwide.

2.      Plaintiffs are among the many protestors, legal observers, and street medics who sustained severe physical and psychological injuries during the mass George Floyd protests that began on May 28, 2020 in Columbus from the targeted and indiscriminate use of so-called "less

1

lethal" munitions, wooden bullets (i.e. "knee knockers"), flash bangs, chemical gas, mace, and pepper spray and the physical and verbal assaults by Columbus Police Officers and mutual aid officers (collectively referred to as "Police Officers" or "Officers" or "Columbus Police Officers").

3. Like former Minnesota Police Officer Derek Chauvin, and the officers who aided him in murdering George Floyd, many Columbus Police Officers demonstrated a shocking disregard for the life and safety of the Columbus residents they swore to protect during the George Floyd protests.

4. This Complaint seeks damages and equitable relief for Defendants' unconstitutional and tortious conduct.

5. Plaintiffs incorporate by reference as if fully rewritten the First Amended Complaint in *Tamara K. Alsaada, et al v. The City of Columbus, et al.*, United States District Court for the Southern District of Ohio Eastern Division, Case No. 2:20-cv-3431 (Chief Judge Algenon L. Marbley), Doc. #: 2.

## II. JURISDICTION AND VENUE

6. This Court has jurisdiction over this action by virtue of 28 U.S.C. §§ 1331 (federal question); § 1343 (civil rights); and § 1367 (supplemental jurisdiction).

7. Declaratory, equitable, and injunctive relief is sought pursuant to 28 U.S.C. §§ 2201; 2202; 42 U.S.C. § 1983; and the common law of the State of Ohio.

8. Under 42 U.S.C. § 1983 and the common law of the State of Ohio, compensatory damages may be awarded against all Defendants and punitive damages be awarded against Defendants Thomas Quinlan and Officer Matthew Houser.

9. Costs and attorneys' fees may be awarded pursuant to 42 U.S.C. § 1988, Fed. R. Civ. P. 54, and the common law of the State of Ohio.

10. Venue lies in this forum pursuant to 28 U.S.C. § 1391(b) and S.D. Civ. R. 82.1 because the claims arose in Franklin County, Ohio where Defendant City of Columbus is located and operates the Division of Police, formerly headed by Defendant Thomas Quinlan, which empowered Columbus Police Officers, including Defendant Officer Matthew Houser, and other mutual aid officers to use force.

## III.    PARTIES

11. Plaintiff Ellen Hana Abdur-Rahim (also known as Hana Ortiz Sanchez) (she/her) is a citizen of the State of Ohio residing in Franklin County, Ohio.

12. Plaintiff Elizabeth Andromeda (she/her) is a citizen of the State of Ohio residing in Franklin County, Ohio.

13. Plaintiff Duck Bardus (they/them) is a citizen of the State of New York residing in Brooklyn, Kings County, New York.

14. Plaintiff Tanya Bils (she/her) is a citizen of the State of Ohio residing in Franklin County, Ohio.

15. Plaintiff Ryan McMullen (he/him) is a citizen of the State of Ohio residing in Franklin County, Ohio.

16. Plaintiff Morgen Morrissette (she/her) is a citizen of the State of Ohio residing in Franklin County, Ohio.

17. Plaintiff Nicholas Pasquarello (he/him) is a citizen of the State of Ohio residing in Franklin County, Ohio.

18. Plaintiff Cole Ramsey (she/her) is a citizen of the State of Ohio residing in Franklin County, Ohio.

19. Plaintiff Gwen Short (she/her) is a citizen of the State of Ohio residing in Franklin

County, Ohio.

20.     Plaintiff Helen Stewart (known as, and referred to throughout this Complaint as, Charlie Stewart) (they/them) is a citizen of the State of Ohio residing in Franklin, County, Ohio.

21.     Plaintiff Lena Tenney (they/them) is a citizen of the State of Ohio residing in Franklin County, Ohio.

22.     Defendant City of Columbus is a political subdivision of the State of Ohio pursuant to Chapter 2744, Ohio Revised Code; at all times material to this Complaint, the employer of Defendants former Chief Thomas Quinlan and Officer Matthew Houser; established policies on and trained, supervised, and disciplined, or failed to do so, its Police Officers in the use of force during demonstrations and retaliating for speech they hated; and entered into agreements with other entities to provide mutual-aid law enforcement personnel under its general direction.

23.     Defendant former Chief Thomas Quinlan, at all times material to this Complaint, was employed by Defendant City of Columbus in its Division of Police as its Chief.  He is a "person" under 42 U.S.C. § 1983 who acted under color of law. Defendant Quinlan convened Division leadership after the May 25, 2020 murder of George Floyd to prepare for protests in Columbus. Quinlan monitored the protests starting on May 28, 2020 in Columbus. But he failed to impose any enforceable or meaningful restraints on the use of less lethal force and failed to provide effective policies and adequate training, supervision, and/or discipline by or on behalf of Defendant City of Columbus in the use of force during demonstrations and retaliating for speech they hated. Quinlan also provided general direction to mutual-aid law enforcement personnel from other entities. He authorized Defendant Officer Houser to use excessive force and knew that Houser had, in fact, used excessive force. Plaintiffs bring suit against Defendant Thomas Quinlan in his individual and official capacities.

24. Defendant Officer Matthew Houser (Badge Number 158), at all times material to this Complaint, was employed by Defendant City of Columbus, Division of Police. Defendant Houser is a "person" under 42 U.S.C. § 1983 who acted under color of law. During the protests, he used or tolerated the use by other officers of an excessive amount of force and received inadequate training, supervision, and/or discipline by or on behalf of Defendant City of Columbus in the use of force during demonstrations and retaliating for speech they hated. Plaintiffs bring suit against Defendant Matthew Houser in his individual and official capacities.

25. Defendants John or Jane Doe 1-30, at all times material to this Complaint, were Columbus Police Officers, employees of the City of Columbus, or mutual-aid law enforcement personnel whose identities are not currently known. Each is a "person" under 42 U.S.C. § 1983. They used or tolerated the use by other Officers of an excessive amount of force and received inadequate training, supervision, and/or discipline by or on behalf of Defendant City of Columbus in the use of force during demonstrations and retaliating for speech they hated. Plaintiffs bring suit against Defendants John or Jane Doe 1-30 both in their individual and official capacities.

## IV. FACTS

### A. Ellen Hana Abdur-Rahim

26. Starting on Wednesday May 27, 2020, Plaintiff Ellen Hana Abdur-Rahim was a community organizer and protester during the George Floyd protests in Columbus. Plaintiff Abdur-Rahim attended protests at the intersection of Lockbourne Road and Livingston Avenue on May 27 in response to the arrest of Christopher Radden, a Black man arrested for peacefully protesting the murder of George Floyd.

27. On Thursday May 28, 2020, around 6 p.m., Plaintiff Abdur-Rahim again joined protesters at the intersection of Lockbourne Road and Livingston Avenue. Later that evening, she

and other protesters went downtown and joined a crowd peacefully standing in the intersection of High Street and Broad Street. The Police had kettled the intersection from three sides, trapping and restricting the protesters' movements. Plaintiff Abdur-Rahim remained with protesters in the intersection and was indiscriminately sprayed with pepper spray and tear gas dozens of times. Around 11 p.m. that evening, as protesters fled the intersection, Plaintiff Abdur-Rahim and another protester were running down the sidewalk on West Broad Street to leave and observed a small number of Columbus Police Officers following close behind them. Without warning or instruction, Officers threw a flash bang (also known as a concussion grenade) at Plaintiff Abdur-Rahim while she was leaving the protest, causing her to stop and flatten herself against the wall of a building to avoid being hit. Officers continued to follow Plaintiff Abdur-Rahim and threw two more flash bangs at her as she fled. Eventually, the Police stopped following her and she was able to return home.

28.     On Friday May 29, 2020, Plaintiff Abdur-Rahim returned to downtown to protest and was pepper sprayed and tear gassed indiscriminately throughout the evening.

29.     On the morning of Saturday May 30, 2020, Plaintiff Abdur-Rahim returned downtown to join the protests. About an hour later, Plaintiff Abdur-Rahim was again on the sidewalk and was indiscriminately pepper sprayed and tear gassed several times. Plaintiff Bardus, a street medic, treated her for injuries from chemical exposure on three separate occasions that afternoon, all on the sidewalk. A photo of one occasion can be viewed here:

6



30.     On another occasion that day, Plaintiff Abdur-Rahim was with Plaintiff Bardus and

several Legal Observers. The Police began chasing and pepper spraying them down the sidewalk

adjacent to Broad Street. Plaintiff Abdur-Rahim ran into Pearl Alley with Plaintiff Bardus and the

Legal Observers to escape from the Police. A line of 4 or 5 Police Officers holding bikes arrived

and blocked off Pearl Alley, preventing them from moving any further. Not a single Officer's badge was visible. Without any warning or giving any commands, Plaintiff Abdur-Rahim observed a Police Officer charge Plaintiff Bardus and Plaintiff Abdur-Rahim sheltered herself inside scaffolding to avoid the Officer. Plaintiff Abdur-Rahim noticed another Officer moving toward her, leaving no choice for Plaintiff Abdur-Rahim but to crawl through the scaffolding while the Officer pursued her. At one point, Plaintiff Abdur-Rahim became stuck in the scaffolding and observed the Police Officer's hand grabbing at her ankle; she did not hear any commands from the Officer as he tried to grab her. Plaintiff Abdur-Rahim was able to crawl out of the scaffolding and escape the alley when the Officers eventually walked away.

31.     On the evening of Saturday May 30, Plaintiff Abdur-Rahim was standing at the intersection of State Street and High Street with a group of protesters on the sidewalk. The Police were in the street, telling people to stay on the sidewalk. Plaintiff Abdur-Rahim observed a woman protester begin to heckle the Officers in the street and asked her to stop, pointing out that Columbus Police were likely to hurt other people because the protester was yelling at them. In the middle of her sentence, Plaintiff Abdur-Rahim was struck by two knee knockers fired by Police as she was standing on the sidewalk. One struck her on the left side of her ribs and the other on her right butt cheek. A photograph of her injuries can be seen here:



32.    From Sunday May 31, 2020 to about a week later, Plaintiff Abdur-Rahim stayed home because she was afraid of being injured by the Police if she went to a protest.

33.    On June 16, 2020, Columbus Mayor Andrew Ginther announced that Officers will

no longer be permitted to use chemical spray or tear gas to disperse non-violent crowds, and that the use of pepper spray will be limited to clear instances of violence.

34.    On June 21, 2020, due to the Mayor's promise of no more chemical agents being used on peaceful protesters, Plaintiff Abdur-Rahim decided to join protesters standing peacefully in the intersection of High Street and Broad Street. Despite what the Mayor had publicly announced, Plaintiff Abdur-Rahim was sprayed with mace and pepper spray alongside other peaceful protesters in the intersection.

35.    On the evening of Tuesday June 23, 2020, Plaintiff Abdur-Rahim was standing on the sidewalk near High Street and State Street searching for a friend who had just been arrested. Plaintiff Abdur-Rahim was attempting to cross the street in the crosswalk when an Officer grabbed her by her book bag and attempted to drag her into the middle of the street. Other protesters grabbed Plaintiff Abdur-Rahim and tried to pull her back toward the sidewalk, the Officer slammed her to the ground and put his knee in her back as he handcuffed her. She was taken to Police Headquarters where she had a mugshot and fingerprints taken. She was returned to the squad car and she then asked to go to the bathroom. The Officer explained they would have to find a female Officer to escort her to the bathroom, but did not attempt to find one. Plaintiff Abdur-Rahim remained handcuffed in the squad car for six hours before Police released her, around 2 a.m.

36.    On multiple occasions during July and August, Plaintiff Abdur-Rahim observed Columbus Police Officers parked in front of her apartment observing her. Plaintiff Abdur-Rahim also observed Columbus Police Officers following her home from protests, including one instance where she and another protester were riding their bikes home and multiple squad cars tailed them. Plaintiff Abdur-Rahim felt so afraid that she got off her bike and hid in an alley until the Police passed and left her alone. Plaintiff Abdur-Rahim started staying in hotels and sleeping on friends'

couches because she did not feel safe in her home with the Columbus Police surveilling her.

37.     As a direct and proximate cause of Defendants' conduct, Plaintiff Abdur-Rahim suffered physical and psychological damages.

**B.     Plaintiff Elizabeth Andromeda**

38.     On May 30, 2020, Plaintiff Elizabeth Andromeda was a protestor in the George Floyd protests in Columbus, Ohio.

39.     Plaintiff Andromeda, who has quadriplegia, joined the protest on High Street near Second or Third Avenue in the Short North, and positioned her motorized wheelchair in the middle of High Steet. She was in this area for about 30 minutes to an hour. There was a small group of protestors who were sitting on High Street facing a line of Police Officers, a half block in front of her. And there were several dozen protestors around her. The Columbus Police appeared to be attempting to push the protestors north up High Street.

40.     Without warning, the Columbus Police began firing tear gas canisters and wooden bullets (known as "knee knockers") indiscriminately into the crowd. Plaintiff Andromeda never heard any dispersal orders. She posed no danger to the Police.

41.     Knee knockers, though considered "less lethal" munitions, are inherently inaccurate, dangerous, and even deadly. They are meant to strike someone with blunt force to incapacitate them like the swing of a baton, but from a distance. They are purportedly designed to be shot at the ground, not directly at people.

42.     There is limited regulation of the development of so-called "less lethal" weapons, like knee knockers, and limited public information provided by manufacturers on their design and guidelines for use.   Despite their inherent danger and inaccuracy, it was the policy of the City of Columbus Division of Police to use knee knockers against peaceful protestors, Legal Observers,

11

and medics exercising their First Amendment rights.

43.     Tear gas is a powder that is heated and mixed with a solvent and released as an aerosol. Tear gas not only irritates cells, but also activates pain receptors, which leads to intense burning pain in the eyes, throat, lungs, skin, and mucous membranes. Tear gas can also cause exaggerated muscle cramping in the eye and sensitivity to light that leads to eye closure. Other effects of tear gas include a difficulty in swallowing, drooling, and severe burning in the mouth. In some cases, it can cause an asthma attack or swelling in the area that could potentially lead to asphyxiation or death.

44.     Though tear gas is banned from use in war by the 1925 Geneva Protocol and the Chemical Weapon Convention (effective in 1997), it was the policy of the City of Columbus Division of Police to use tear gas against peaceful protestors, Legal Observers, and medics exercising their First Amendment rights.

45.     Once the Columbus Police began firing at the protestors on High Street, Plaintiff Andromeda was not able to leave the area quickly because it was difficult to navigate her wheelchair on the crowded street. She was a vulnerable target.

46.     The Columbus Police fired knee knockers that struck Plaintiff Andromeda's wheelchair.

47.     The Police then launched a tear gas canister that became lodged in Plaintiff Andromeda's wheelchair. The canister burned her pants and she felt the heat from the canister on her legs in which she has some sensation. The canister's chemical contents enveloped Plaintiff Andromeda and sprayed into her face and mouth at point blank range, causing intense burning pain in her eyes, throat, lungs, and skin and leaving her gasping for breath. Due to the burning and pain, she was unable to flee the area while the canister was lodged inside the wheelchair.

48.     The protestors around her began to scream and run away from where she was positioned due to the tear gas. Plaintiff Andromeda yelled for help, and several protestors attempted to help her, but could not come close enough due to the tear gas.

49.     Terrified and in severe pain, Plaintiff Andromeda pressed a button to lift the legs of her wheelchair up and down in an attempt to dislodge the canister.

50.     After having been trapped and gassed for about 30 seconds, Plaintiff Andromeda managed to dislodge the canister and flee in her wheelchair from the Police who continued to fire their "less lethal" weapons.

51.     A still shot from a video showing Plaintiff Andromeda enveloped in gas is below:



52.     Since there were people on the sidewalk, Plaintiff Andromeda fled north up High Street. She maneuvered to a side street leading to her car that was parked in the parking lot at Goodale Park.

53.     In addition to her physical injuries, Plaintiff Andromeda also suffered psychological injuries from the incident, including PTSD, and received treatment for her injuries.

54.     Though Plaintiff Andromeda attended other Police protests in Columbus, after the incident she stayed far away from where the Police were positioned due to her fear that they would shoot her with wooden bullets and gas canisters again.

**C.     Plaintiff Duck Bardus**

55.     Starting on May 28, 2020, Plaintiff Duck Bardus served as a street medic during the George Floyd protests in Columbus, Ohio. At all material times, Plaintiff Bardus was First Aid and CPR certified. At all material times, Plaintiff Bardus wore clothing that identified them as a medic.

56.     On Thursday May 28, 2020, Plaintiff Bardus arrived at the intersection of Lockbourne Road and East Livingston Avenue, an area East of downtown Columbus, to provide medical treatment to protestors, Legal Observers, and other individuals at the George Floyd protests. Plaintiff Bardus had intended to hand out water, snacks, and electrolyte gels. Plaintiff Bardus carried a medical pack with 6 to 8 eye flushes, baby wipes, water, band aids, basic wound care, gauze/medical tape, and snacks. They in no way anticipated the carnage the Police would inflict over the next several days and weeks.

57.     Around 7 or 8 p.m., the protests moved to downtown Columbus. Around that time, a crowd of protestors had gathered at the intersection of High Street and Broad Street. The Police had kettled the intersection from 3 sides, trapping and restricting the protestors' movements. While

Plaintiff Bardus was providing medical treatment to protestors in the intersection, they were indiscriminately sprayed with pepper spray and tear gas dozens of times. Plaintiff Bardus was using a medical tent, set up on the sidewalk, that contained water and medical supplies. The Columbus Police destroyed the medical station, sprayed it with pepper spray, and dumped out the water containers.  At one point, while Plaintiff Bardus attempted to provide medical assistance to a man on the Ohio Statehouse steps, they were pepper sprayed in the face by the Police, even though they had their hands up and identified themselves as a medic.

58.     On Friday May 29, 2020, Plaintiff Bardus served as a medic for the protests. They were again indiscriminately sprayed with pepper spray numerous times. At one point, the Columbus Police sprayed pepper spray at the protestors, and as the protestors, including Plaintiff Bardus, ran in the other direction to escape, the Police fired tear gas in the area to which the protestors were fleeing.

59.     On Saturday May 30, 2020, Plaintiff Bardus served as a medic for the protests. While they were on the sidewalk, they were again indiscriminately sprayed with pepper spray and tear gas. Near High Street and Broad Street, Plaintiff Bardus attempted to move a protestor to a safe area to provide medical treatment. The protestor was having an allergic reaction to the pepper spray, and Plaintiff Bardus feared that the protestor might die. Plaintiff Bardus approached a Police Officer who was pepper spraying protestors and asked the Officer to call an ambulance, explaining that the protestor was having the allergic reaction and might not live. The Officer shrugged his shoulders and did nothing to help.   Plaintiff Bardus was able to reach a safe area with the injured protestor where they were able to call an ambulance themselves. Plaintiff Bardus provided medical aid to the protester for an hour while they waited; the ambulance never came but the protester was able to recover.

15

60.     On another occasion that day, Plaintiff Bardus was with a fellow street medic and several Legal Observers. The Police began chasing and pepper spraying them down the sidewalk adjacent to Broad Street. Plaintiff Bardus, their small group, and other protestors ran into Pearl Alley to escape from the Police. A line of 4 or 5 Police Officers holding bikes arrived and prevented those in Pearl Alley from moving any further. Not a single Officer's badge was visible. Without any warning or giving any commands, one Police Officer charged Plaintiff Bardus, but they were able to side-step the Officer and he glanced off their shoulder. A moment later, the same Officer regained his footing and charged a female Legal Observer, spraying her directly in the face. Plaintiff Bardus was able to escape the alley when the Officers eventually walked away.

61.     On Sunday May 31, Monday June 1, and Tuesday June 2, 2020, Plaintiff Bardus served as a medic for the protests. Plaintiff Bardus was indiscriminately pepper sprayed and inhaled tear gas numerous times these three days while providing medical treatment to protestors.

62.     On May 31, Plaintiff Bardus was kneeling down at Broad Street and High Street to treat a protestor when the Police began firing knee knockers at them.  A young male protestor jumped in front of Plaintiff Bardus and blocked the bullets from striking their face.

63.      On Tuesday June 2, Plaintiff Bardus noticed a rash on the right side of their body caused by the chemical irritants utilized by the Police.

64.     After the first week of protest, due to the violence the Police were inflicting on protestors, Plaintiff Bardus made drastic revisions to the supplies they carried. By this time, Plaintiff now carried triangular, butterfly and tourniquet bandages, QuikClot, a SAM (structural aluminum malleable) splint, saline, chest seals and a nasal intubation device, but not a single bottle of water. Plaintiff Bardus also carried a pulse oximeter and Benadryl due to Police not offering assistance during medical emergencies and ambulances not coming.  Plaintiff Bardus carried a

helmet and gas mask for their protection.

65.     From June 3 to June 20, 2020, Plaintiff Bardus served as a medic for the protests on nearly all days.

66.     On June 16, 2020, Columbus Mayor Andrew Ginther announced that Officers would no longer be permitted to use chemical spray or tear gas to disperse non-violent crowds, and that the use of pepper spray will be limited to clear instances of violence.

67.     On June 21, 2020, Plaintiff Bardus witnessed several disturbing events. Despite the Mayor's June 16, 2020 Order, they were sprayed directly in the face with pepper spray and witnessed the Police pepper spray a double amputee directly in the face; and they witnessed Defendant Matthew Houser intimidate and target street medics with excessive use of force. Plaintiff Bardus witnessed Defendant Houser physically assault a fellow medic, which left a hand mark on her chest, and physically assault another medic who was only 17 years old. Defendant Houser intentionally targeted and retaliated against medics at the protests, including Plaintiff Bardus, for exercising their First Amendment rights.

68.     On multiple occasions during the month of July, Plaintiff Bardus noticed Police Officers sitting in cruisers parked outside their house observing them. Since the start of the protests, Plaintiff Bardus had been featured in a New York Times article and an Amnesty International report regarding the violence they experienced at the hands of Columbus Police. Plaintiff Bardus owned their home and their name and address were publicly searchable. At one point in July, Plaintiff Bardus walked their dog on the sidewalk while a Columbus Police Officer drove slowly behind them, following for several minutes. While Plaintiff Bardus did not engage with any of the Officers who stalked them, Plaintiff Bardus believes they were the target of intimidation tactics that culminated with an assault on July 31, 2020.

69.      On July 31, 2020, Plaintiff Bardus served as a medic at a protest at the Fraternal Order of Police office at 222 East Town Street in Columbus. There were approximately 30 people at the protest. Plaintiff Bardus stood shoulder to shoulder in a line of protestors, marked as a medic. While Plaintiff Bardus was filming a protestor being arrested, without warning Defendant Houser grabbed their phone and spiked it on the ground, shattering it. Defendant Houser then reached out, grabbed Plaintiff Bardus by the throat, and choked Plaintiff Bardus. The clip was later played on the news, which humiliated Plaintiff Bardus. A photograph showing Defendant Houser grabbing Plaintiff Bardus's throat is below:



70.     In addition to their physical injuries, Plaintiff Bardus also suffered psychological injuries from the incident, including PTSD, and received and continues to receive intensive treatment for their psychological injuries.  As a direct and proximate cause of Defendants' conduct, Plaintiff Bardus lost their job and is unable to work, lost their house, lost their spouse, left Columbus due to no longer feeling safe there, is afraid to go outside, and has recurring nightmares about the Police and Defendant Houser.

**D.     Tanya Bils**

71.     Plaintiff Tanya Bils was a protestor on several occasions during the George Floyd protests in Columbus.

72.     On June 21, 2020, Plaintiff Bils was protesting in the intersection of High Street and Broad Street in the afternoon. Plaintiff Bils thought it would be a calm day and wore summer clothes. The Columbus Police had blocked the road from traffic, so Plaintiff Bils was not blocking the movement of any vehicles from passing through the intersection.

73.     Plaintiff Bils was holding a plywood sign with Tyree King's name written on it. Tyree King was a 13-year-old child who was shot and killed by a Columbus Police Officer in 2016. Tyree reportedly had a toy gun and was facing away from the Officer at the time he was shot. The responsible office was not indicted for the killing, which resulted in protests in Columbus.  In defending the Officer, Mayor Ginther stated at a press conference that Tyree was "involved in very, very dangerous conduct" and that "it is a dangerous time to be a Police Officer in this county." At the same press conference, then Columbus Police Chief Kim Jacobs stated that the sentiment among the Police at the scene was that they "were very disturbed about the fact that here we are, out at this time of the night chasing armed 13-year-olds."

19

74.     While Plaintiff Bils was protesting on June 21, 2020, the Columbus Police and mutual aid officers formed a line in front of Plaintiff Bils and other protestors across High Street and Broad Street. Plaintiff Bils heard no orders from the individual Officers or over a loudspeaker. After a protestor on the street corner appeared to do something to instigate the Police, without warning, a Columbus Police Officer approached Plaintiff Bils, grabbed and broke her sign, and threw his body into her. The Columbus Police Officer did so because he hated the speech her sign conveyed. Plaintiff Bils bent down and covered her head to protect herself, while the Police Officer continued to assault her. While she was bent down, the Officer sprayed her with pepper spray in the ear and face. Her face burned and she could not see. Plaintiff Bils did nothing to instigate the Police and posed no threat. The Officer did not charge Plaintiff Bils with any crime and walked away.

75.     The same day, Plaintiff Bils was indiscriminately tear gassed by the Police, which irritated her lungs.

76.     As a direct and proximate cause of the assault, Plaintiff Bils sustained psychological and physical injuries, including an injury to her hip and bruises on her shoulder, hip, and legs. After receiving medical treatment, Plaintiff Bils has permanent damage to her hip and walks with a limp when it flares up.

**E.     Ryan McMullen**

77.     Starting on May 29, 2020, Plaintiff Ryan McMullen frequently participated as a protestor during the George Floyds protests in Columbus.

78.     Plaintiff McMullen served in the United States Army from 2006 to 2010. He deployed with the 3rd Special Forces Group to Afghanistan in 2009 as an intelligence specialist tasked with accompanying Operational Detachments on combat missions, providing tactical

updates and direct engagement support. Plaintiff McMullen went on to deploy three more times as a civilian intelligence trainer, once with Army Criminal Investigation Division, once with the 82nd Airborne, and once with Navy SEALs.

79.     Plaintiff McMullen observed that the Columbus Police's purported "crowd control" techniques employed against unarmed civilians during the protests were more antagonistic, combative, confrontational, and violent than any he had witnessed in combat zones.

80.     Plaintiff McMullen inhaled tear gas and pepper spray indiscriminately sprayed in his direction on numerous occasions the first few days of the protests.

81.     On May 29, 2020, Plaintiff McMullen was on the lawn of City Hall with a group of protestors complying with the Columbus Police Officers' order to stay out of the street. Without warning, the Columbus Police Officers began spraying the protestors who remained on the lawn with pepper spray, which also went into Plaintiff McMullen's face and eyes, causing intense burning. A video showing a portion of the interaction can be accessed here: https://www.dropbox.com/s/wec7fi59k2bc56l/20200529_211359.mp4?dl=0

82.     The Columbus Police Officers' actions antagonized and aggravated the crowd. The general sentiment among the protestors was that even when they were doing their best to comply with Police orders, the Police would still punish them because they hated their speech.

83.     On the morning of May 30, 2020, near Huntington Bank and Pizza Rustica, Columbus Police Officers positioned their bicycles on the curb and jammed the frame of their bicycles into the protestors to keep them on the sidewalk. Other Columbus Police Officers were on horses walking along the sidewalk on the other side of the protestors, harassing and pinning the protestors against the other Officers' bicycles. These actions made it extremely difficult to move or comply with any Officers' orders, and confused the protestors as to what the Police wanted

them to do. A photo of the interaction is here:



84.     The ethos among protestors was that White protestors should place themselves

between Columbus Police Officers and Black protestors in the expectation that Columbus Police Officers would be less likely to use excessive force against White protestors than Black protestors. In this regard, Plaintiff McMullen, a White male, could hear Columbus Police Officers calling out and identifying Black protestors to fellow Officers, especially Black female protestors who were leaders. And Plaintiff McMullen observed Police pull Black leaders out of the crowd to arrest them. For example, in one instance, a Black leader was pulled by an Officer onto an Officer's bicycle and was arrested and charged with assaulting an Officer. Plaintiff McMullen recognized these tactics of identifying and removing leaders and organizers from the crowd as similar to military and/or antiterrorism tactics.

85.     On May 30, 2020, Plaintiff McMullen entered Broad Street near the intersection with Grant Street in downtown Columbus to place himself and his bicycle between a Black female protestor and a line of Columbus Police Officers.

86.     The protestor and Plaintiff McMullen were standing far back from the line of Police Officers, acting peacefully, and posed no threat to the Police. The line of Columbus Police Officers had blocked traffic, so the Black female protestor and Plaintiff McMullen were not blocking traffic. The Columbus Police Officers began to shoot munitions, including knee knockers, at Plaintiff McMullen and the Black protestor, which struck them both. A video showing the interaction can be accessed here:

https://www.dropbox.com/s/lru4r4s9a7lxvmy/NVJsdIyda1_F0nHG.mp4?dl=0

87.     Plaintiff McMullen was struck several times in his legs. Several protestors carried the Black female protestor from the street who appeared to be severely injured.

88.     On May 31, 2020, Plaintiff McMullen was participating in a peaceful protest at Broad Street and High Street with a group of other protestors who were kneeling. A video showing

the interaction can be accessed here:

https://www.dropbox.com/s/gmpl4b1qsu7avqu/20200531_194910.mp4?dl=0

89.    The line of Columbus Police Officers had blocked traffic, so Plaintiff McMullen and the other protestors were not blocking traffic.

90.    A large military style vehicle pulled up in front of the group. Officers in full tactical gear exited the vehicle. The Officers began firing their less lethal weapons at point blank range indiscriminately at the group of protestors. A video showing a portion of the interaction can be accessed here: https://www.dropbox.com/s/a9xrin7ks41ewfj/20200531_195319.mp4?dl=0

91.    As Plaintiff McMullen and the other protestor began to run away, he was struck in the right leg and right foot with wooden bullets. The Columbus Police Officers continued to fire at Plaintiff McMullen and the other protestors after they reached the sidewalk and were running away. The Columbus Police Officers appeared to fire directly at the Plaintiff McMullen and the other protestors, rather than skipping the shots off the ground. A photograph of Plaintiff McMullen's injured leg is below:



92. A photograph of Plaintiff McMullen's injured ankle/foot is below:



93.     The wound on Plaintiff McMullen's leg became infected and took three months to

heal and the foot took a few weeks to heal. Plaintiff McMullen has four permanent scars on his

right leg and two on his left leg from the wooden bullets.

94.     As a direct and proximate cause of Defendants' conduct, Plaintiff McMullen

sustained physical injuries and his PTSD was triggered and substantially aggravated and caused

depression.

### F.    Morgen Morrissette

95.    Plaintiff Morgen Morrissette frequently participated as a Legal Observer during the mass George Floyd protests in Columbus. While at the protests, she wore a neon green hat that identified her as a Legal Observer associated with the National Lawyers Guild. At the protests, Plaintiff Morrissette was on constant alert of being pepper sprayed, assaulted, and gassed by the Columbus Police.

96.    On May 30, 2020, Plaintiff Morrissette served as a legal observer primarily on Broad Street between High Street and Cleveland Avenue. Plaintiff Morrisette was wearing a neon green Legal Observer hat. She was with one other Legal Observer and two medics. Around 6:50 p.m., the Columbus Police shot tear gas near Plaintiff Morrissette, which she inhaled. Around 7:09 p.m., the Columbus Police shot wooden bullets in the crowd near Plaintiff Morrissette. Several minutes later, around 7:16 p.m., Plaintiff Morrissette observed the Columbus Police arresting a protestor near Broad Street and 5th or 6th Street. She attempted to approach the protestor to obtain their name and date of birth, but the Police blocked her. Moments later, the Columbus Police tear gassed Plaintiff Morrissette. While she was in the plume of chemical gas, she and about 4 to 6 other people were surrounded by several Columbus Police Officers who pepper sprayed the group from all sides, preventing them from escaping the gas. About an hour later, at 8:14 p.m., a Columbus Police Officer launched a surprise attack from an alley on Plaintiff Morrissette and a group around her near Broad Street and Cleveland Avenue, and tear gassed them.

97.    On June 21, 2020, Plaintiff Morrissette was serving as a Legal Observer near Broad Street and High Street. Plaintiff Morrissette was wearing a neon green Legal Observer hat. Plaintiff Morrissette was pepper sprayed multiple times by the Columbus Police when they indiscriminately

pepper sprayed a group of protestors. Plaintiff Morrissette observed the Police arresting a protestor, but the Police would not permit Plaintiff to obtain the protestor's name and date of birth.

98.     On June 23, 2020, Plaintiff Morrissette was serving as a Legal Observer at Columbus City Hall. The Columbus Police pepper sprayed the protestors who were standing on the sidewalk. Around 7:30 p.m., Plaintiff Morrissette observed Defendant Officer Matthew Houser and another Officer arresting a female protestor. They positioned the woman face down on the ground, similar to George Floyd, and appeared to be kneeling on her. Without interfering with Defendant Houser's and the other Officer's brutal and unjustified treatment of the woman, Plaintiff Morrissette approached to obtain the woman's name and date of birth, but Defendant Houser violently shoved Plaintiff Morrissette in the upper chest/neck area. Defendant Houser's action had the intended effect of preventing Plaintiff Morrissette from gathering information to document the incident, and ultimately, ensure Police Officers are held accountable.

99.     As direct and proximate cause of Defendants' conduct, Plaintiff Morrissette suffered physical and psychological damages, including an anxiety disorder and PTSD.

100.     Plaintiff Morrissette sought therapy for the psychological trauma she suffered, and continues to receive such treatment, due to Defendants' conduct.

**G.     Nicholas Pasquarello**

101.     From May 28, 2020 to August 2020, Plaintiff Pasquarello served as a Legal Observer during the George Floyd protests in Columbus on 25 to 30 different days.

102.     While at the protests, he wore a neon green hat that identified him as a Legal Observer for the National Lawyers Guild. The National Lawyers Guild has sent Legal Observers to protests in Columbus and across the United States for many years. During the George Floyd protests, the Columbus Police were aware of the National Lawyers Guild Legal Observers and

28

could easily identify them.

103.     On May 28, 2020, Plaintiff Pasquarello served as a Legal Observer near Broad Street and High Street. While treating protestors, he was indiscriminately sprayed with pepper spray, which caused him severe pain on his eyes and difficulty breathing.

104.     On May 30, 2020, Plaintiff Pasquarello was serving a Legal Observer for the George Floyd protests near the West Goodale parking garage in the Short North. Plaintiff Pasquarello was wearing his neon green Legal Observer hat. A lone Columbus Police Officer walked toward Plaintiff Pasquarello, who was walking on a sidewalk, and without warning or saying anything sprayed Plaintiff directly in the face with pepper spray.  The Officer pointed toward the parking garage, signaling for Plaintiff Pasquarello to walk into the garage, where the Columbus Police had apparently kettled and seized other people who were participating in the protests. A video showing a portion of the incident can be accessed here:

https://www.dropbox.com/s/52h8wxzulcor2oj/281651294_1041166360127054_1667642141420668646_n.mp4?dl=0

105.     Street medics put saline in his eyes to relieve the intense pain. Plaintiff Pasquarello was in the garage for 15 to 20 minutes, when the Columbus Police walked away, allowing him and others to leave.

106.     On May 30, 2020, Plaintiff Pasquarello also served as a Legal Observer outside Columbus City Hall. Without warning, the Columbus Police began shooting less lethal munitions into a crowd of protestors, street medics, and Legal Observers. He did not hear any dispersal orders. Plaintiff's partner who was with Plaintiff Pasquarello was struck by a munition shot by the Police.

107.     After the incidents on May 30, Plaintiff Pasquarello changed the manner in which he served as a Legal Observer. He attended the protests, but stayed far away from Police Officers and their interactions with protestors, to avoid being pepper sprayed or shot with munitions.

108. Defendants' misconduct has chilled Plaintiff Pasquarello's protected First Amendment activities. Since the George Floyd protests, Plaintiff Pasquarello has not served as a Legal Observer. Though he was heavily involved in community organizing prior to the George Floyd protests, he has not been active since the protests.

109. As a direct and proximate cause of Defendants' conduct, Plaintiff Pasquarello suffered physical and psychological damages.

**H. Cole Ramsey**

110. Beginning on May 30, 2020 and through July of 2020, Plaintiff Cole Ramsey served as a street medic during the George Floyd protests in Columbus, Ohio on a nearly daily basis. Plaintiff Ramsey has taken Street Medic Training and is CPR and First Aid Certified.

111. On May 30, 2020, Columbus Mayor Andrew Ginther issued an executive order instituting a city-wide curfew that required most residents to remain indoors from 10:00 p.m. to 6:00 a.m. The executive order exempted all "medical personnel" from the curfew. The executive order may be accessed here:

https://www.dropbox.com/s/6vfqzmvklbnzu7v/Emergency%20Curfew%20%282%29.pdf?dl=0

112. On June 2, 2020, while the curfew order was in effect, Plaintiff Ramsey, her minor son, and other street medics were driving around Columbus providing medical treatment to protestors. Plaintiff's vehicle was marked with red crosses on the side windows and on the rear window, indicating that the vehicle was transporting street medics. Plaintiff Ramsey and the other occupants in her vehicle were wearing shirts with red crosses on them identifying them as medics. Plaintiff had goggles in her vehicle that she used to protect herself from pepper spray when treating protestors, due to the Police's indiscriminate pepper spraying.

113. Around 11:30 p.m., Plaintiff Ramsey stopped her vehicle to provide medical

treatment to 3 or 4 protestors near Lowe's Home Improvement near Hudson Street. After helping the protestors, Plaintiff Ramsey drove to State Route 3 and approached Fifth Avenue, and observed Columbus Police Officers telling a group of people to go home. From that location, Plaintiff Ramsey drove to the intersection of 9th Street and Second Avenue to pick up another medic named Amber who was treating protestors. One of the medics exited the vehicle to retrieve Amber, but returned shouting, "The Police are beating the shit out of Amber! We've got to go, we've got go!"

114.    Terrified, Plaintiff Ramsey decided to drive straight home to South Linden. After she began to drive home on 9th Street, a large military-style vehicle pulled up towards Plaintiff Ramsey's vehicle on the driver's side, and 2 to 3 Police cruisers and a Police van pulled up behind Plaintiff's vehicle.  Plaintiff immediately stopped her vehicle.

115.    A Police Officer in full riot/military gear exited the military vehicle and walked up to her vehicle. Plaintiff Ramsey informed the Officer that they were street medics assisting protestors and that they were on their way home. In complying the Officer's commands, Plaintiff provided the Officer her driver's license and informed the Officer that she lived in South Linden. The Officer then shined his light into her car and saw Plaintiff's googles and immediately changed his demeanor. He exploded that Plaintiff Ramsey was a "rioter" and "terrorist" and pulled her out of the vehicle. Another Officer walked up and put Plaintiff in zip ties. Plaintiff Ramsey informed that they were just out helping people and also informed that her son was in the vehicle and that he was a minor. She pleaded with the Officer to let her drive home. The Officer told Plaintiff Ramsey that it was not his decision, it was Mayor Ginther's, and that he was only following orders. As she was being taken away, Plaintiff yelled, "Please don't take me away from my son."  But the Officer told Plaintiff Ramsey that he would be arresting her son too. He also told her that she was a "bad mother" and a "terrorist disobeying a lawful curfew order." The other Officers on the scene

then arrested Plaintiff's son and the other street medic in the vehicle. After the Officers placed Plaintiff's son under arrest and secured his hands in zip ties, he had a panic attack, which the Officers began to mock. The arresting Officer told everyone in the vehicle that they were "awful people."

116.     The Police Officers booked Plaintiff, her son, and the other medic at the Fire Station in Franklinton. From there, the Police took Plaintiff's son home, but took Plaintiff and the other medic to Franklin County Corrections Center on Jackson Pike in Columbus. At the center, the Police strip searched her. While she was being strip searched, the Police allowed a male arrestee to walk in and observe her naked. She spent the night in jail.

117.     The next morning, on June 3, 2020, Plaintiff Ramsey was released after she posted bond. The charges against her were eventually dropped.

118.     On June 21, 2020, Plaintiff was downtown Columbus to provide medical treatment to protestors. Although she observed that there was a small group of few protestors at first, and everyone was peaceful and on the sidewalk, the Police greatly increased their presence in the street. Officers on bicycles began antagonizing protestors on the sidewalk by shoving their bicycles against them and pepper spraying them. Plaintiff spoke with a Sergeant at the Statehouse and told him that the increased Police presence would instigate people and bring them into the street. The best way to keep them out was for the Police to deescalate. The Sergeant disregarded Plaintiff, responding that Mayor Ginther wanted the streets cleared that day.

119.     The incident on June 2, 2020 caused Plaintiff Ramsey severe mental distress and PTSD with which she has been diagnosed.

120.     As a direct and proximate cause of Defendants' conduct, Plaintiff Ramsey suffered physical and psychological damages.

**I.      Gwen Short**

121.    Plaintiff Gwen Short was a protestor on approximately 10 different dates during the George Floyd protests in Columbus.

122.    On May 30, 2020, Plaintiff Short was protesting on High Street in the Short North. Without warning, the Columbus Police or other mutual aid officers began shooting tear gas canisters into the crowd. One canister landed near Plaintiff Short. The gas irritated her eyes. To protect herself and others from the gasses it was spewing, Plaintiff Short picked up the canister to throw it away. The gas canister severely burned Plaintiff Short's hand. Her burns took three weeks to heal, but she still has scarring from the burns. Below is a photograph of Plaintiff Short's hand:



123.    It was reasonably foreseeable that protestors would attempt to pick up the gas

canisters to protect themselves and others. Defendants knew that picking up a gas canister would cause a person severe burns, and yet, they still utilized tear gas, recklessly disregarding a substantial risk of harm to Plaintiff Short and other protestors.

124.    On numerous other occasions during the protests, Plaintiff Short was indiscriminately tear gassed and pepper sprayed, which caused her pain and eye irritation.

125.    As a direct and proximate cause of Defendants' conduct, Plaintiff Short suffered physical and psychological damages.

**J.      Charlie Stewart**

126.    Plaintiff Charlie Stewart is part of the Black Queer & Intersectional Collective (BQIC), a grassroots organization that fights against state-sanctioned violence. BQIC is a Black, LGBTQIA+ organization, that has been harassed and targeted by the Columbus Police in the past.

127.    From May 29, 2020 to June 3, 2020, Plaintiff Stewart participated as a protestor during the mass George Floyds protests that occurred in Columbus, including as part of the BQIC. After this time period, throughout the Summer of 2020, Plaintiff Stewart attended police protests 2 to 3 times per week. Throughout the protests, Plaintiff Stewart was pepper sprayed, tear gassed, and shot with wooden bullets numerous times. The Long Range Acoustic Device (LRAD) machine used by the Columbus Police during the protests caused Plaintiff Stewart hearing damage and severe headaches.

128.    On May 29, 2020, Plaintiff Stewart was pepper sprayed and tear gassed by the Columbus Police. In the evening, in several instances, the Police kettled the protestors, shot tear gas over the protestors, then forced the protestors, including Plaintiff Stewart, to walk through the gas. Once the protestors would walk through it, they would encounter more Police who would instruct them to walk back through the gas or instruct them to different areas in which the Police

34

would shoot more tear gas.

129.    In the evening, while Plaintiff Stewart was in front of the Rife Building on the High Street sidewalk, the Columbus Police shot them with a wooden bullet in their arm, which knocked them to the ground and caused bruising and lack of mobility.

130.    On May 30, 2020, Plaintiff Stewart was exposed to chemical gas approximately 12 times as part of the Columbus Police's indiscriminate and targeted use of chemical gasses on the protestors. In the late morning, Plaintiff Stewart saw Columbus City Council President Shannon Hardin downtown at the protest and gave him a hug. He and Congresswoman Joyce Beatty had come to show their support for the protest. A moment later, Plaintiff Stewart observed the Columbus Police pepper spray both Council President Hardin and Congresswoman Beatty. Plaintiff Stewart was shocked to see the Police assault two of the most prominent leaders in Columbus who, in addition to their political stature, are also Black. Some of the pepper spray also went in Plaintiff Stewart's eyes, causing them to burn.

131.    On May 31, 2020, Plaintiff Stewart began menstruating, even though they had just finished their period the week before. Plaintiff Stewart continued menstruating for the next two months. Because Plaintiff Stewart is trans/two-spirit, their gender dysphoria became extremely bad during this time period, which prevented them from doing their usual organizing work.

132.    As a direct and proximate result of Defendants' conduct, Plaintiff Stewart suffered severe physical and psychological injuries, including aggravated PTSD, gender dysphoria, panic attacks, agoraphobia, being afraid to leave their house, difficulty maintaining healthy relationships, hearing loss, issues breathing, severe cramping and irregular and continuous periods, fear of conducting organizing activities against state violence though BQIC, and an adverse impact to their job as an outreach manager for Ohio Voice, an organization that supports many Ohio non-

profits and coalitions.

**K.    Lena Tenney**

133.    Starting on Friday May 29, 2020, Plaintiff Lena Tenney participated as a protestor on most days that the mass George Floyds protests occurred in Columbus.

134.    In the afternoon of May 30, 2020, Plaintiff Tenney was standing in a line of people inside a crosswalk at Broad Street and High Street in downtown Columbus. Plaintiff Tenney was in the front line of protestors, facing a group of Columbus Police Officers.

135.    Without warning, Plaintiff Tenney observed Columbus Police Officers spray pepper spray into the group of protestors. As Plaintiff Tenney was fleeing from the pepper spray, and reached the sidewalk, the Columbus Police Officer directly aimed and discharged their so-called "less lethal" weapons at them and the other protestors. The Police shot Plaintiff Tenney with a wooden bullet directly in their right knee, causing them severe pain.  A video of the incident may be accessed here (Plaintiff Tenney is shot at minute mark 16:40):

https://www.dropbox.com/s/nrewptx9u43drjo/5.30.20-2%20%281%29.mp4?dl=0

136.    A photograph of Plaintiff Tenney's knee after the Police shot it is below:



137. But that did not deter them. Despite being shot, Plaintiff Tenney managed to continue protesting. After they were shot, they were pepper sprayed and tear gassed multiple additional times.

138. On June 1, 2020, Plaintiff participated as a protestor in the George Floyd protests. Plaintiff Tenney inhaled the chemical gasses that the Columbus Police indiscriminately sprayed at protestors.

139. On June 2, 2020, Plaintiff Tenney sought medical treatment at Ohio State Wexner Medical Center for their right knee and leg injuries caused by the Police shooting.

140. On July 2, 2020 an MRI showed that the wooden bullet had fractured their knee and caused a deep bone bruise. Plaintiff Tenney's right leg also sustained nerve damage. The injury

to Plaintiff Tenney's right knee and leg is permanent. Plaintiff Tenney now walks with a limp. They use a knee brace and sometimes must use a cane.

141.    On June 21, 2020, Plaintiff Tenney was a protestor in a group of other protestors near Broad Street and High Street in downtown Columbus. Without warning, the Columbus Police Officers began shoving and striking Plaintiff Tenney and other protestors with their bicycles. Sometime later, a female Officer ripped a protest sign out of Plaintiff Tenney's hands and began punching Plaintiff Tenney. They were hit so hard, their phone was ejected from their pocket and was lost. The Officer also sprayed pepper spray into Plaintiff Tenney's face at close range.

142.    The pepper spray and chemical gasses used by the Police against Plaintiff Tenney and other protestors caused Plaintiff Tenney pain, irritation, asthma attacks, congestion, post-nasal drip, and difficulty breathing that has yet to resolve.

143.    As a direct and proximate cause of Defendants' conduct, Plaintiff Tenney suffered physical and psychological damages during the George Floyd protests.

144.    In October 2020, Plaintiff Tenney was diagnosed with PTSD caused by the Columbus Police's unlawful conduct during the George Floyd protests.

V.    **CLAIMS FOR RELIEF**

A.    **First Count: Violation of Fourth and Fourteenth Amendment Rights**

145.    Plaintiffs re-allege the above paragraphs as if fully rewritten.

146.    By using excessive force, Defendants Officer Matthew Houser and John and Jane Doe 1-30 violated the privacy and bodily integrity protected by the Fourth and Fourteenth Amendments of Plaintiffs.

147.    By their deliberate indifference to the policies, training, supervision, and discipline needed to prevent Police Officers and mutual aid law enforcement personnel from using excessive

force in circumstances similar to those involving the protests, Defendants City of Columbus and former Chief Thomas Quinlan caused the deprivation of civil right and injuries to Plaintiffs, violating the Fourth and Fourteenth Amendments.

**B.      Second Count: Violation of First and Fourteenth Amendment Rights**

148.    Plaintiffs re-allege the above paragraphs as if fully rewritten.

149.    Defendants Officer Matthew Houser and John and Jane Doe 1-30 violated Plaintiffs' First and Fourteenth Amendment rights by punishing Plaintiffs for assembling and exercising their freedom of expression and association of Plaintiffs and other protestors, Legal Observers, and street medics.

150.    By their deliberate indifference to the policies, training, supervision, and discipline needed to prevent Police Officers and mutual aid law enforcement personnel from retaliating against speakers and speech they hated, Defendants City of Columbus and former Chief Thomas Quinlan caused Plaintiffs to be punished for assembling and exercising their freedom of expression and association and caused the officers' attempts to discourage assembly, expression, and association of Plaintiffs and other protestors, Legal Observers, and street medics, violating Plaintiffs' rights provided by the First and Fourteenth Amendments.

**C.      Third Count: Gross Negligence**

151.    Plaintiffs re-allege the above paragraphs as if fully rewritten.

152.    By their willful, wanton, and reckless acts or omissions, including but not limited to, using excessive force, punishing protestors, street medics, and Legal Observers for their assembly, speech, association, seeking to discourage them, and/or failing to adopt effective policies or adequately train, supervise and discipline Police Officers, Defendants former Chief Thomas Quinlan, Matthew Houser, and John and Jane Doe 1-30, committed gross negligence in

dereliction of their duty to preserve and protect the citizens and residents of the City of Columbus.

      **D.**    **Fourth Count: Battery**

153.    Plaintiffs re-allege the above paragraphs as if fully rewritten.

154.    By their willful, wanton, and reckless acts or omissions, including but not limited to, engaging in, authorizing, and ratifying excessive force and seizure, Defendants former Chief Thomas Quinlan, Officer Matthew Houser, and John and Jane Doe 1-30 committed battery under the common law of the State of Ohio.

      **E.**    **Fifth Count: False Arrest and Imprisonment - Enforcement of Unconstitutional Executive Order of Mayor Ginther**

155.    Plaintiffs re-allege the above paragraphs as if fully rewritten.

156.    On June 2, 2020, Plaintiff Cole Ramsey was purportedly arrested for violating Mayor Ginther's Executive Order.

157.    Defendants had no probable cause to arrest Plaintiff Cole Ramsey.

158.    Plaintiff Cole Ramsey was exempt from Mayor Ginther's Executive Order.

159.    At the time of her arrest, Mayor Ginther's Executive Order violated the Ohio and U.S. Constitutions. The Executive Order was facially unconstitutional and unconstitutional as applied to Plaintiff Cole.

160.    On June 6, 2020, a federal lawsuit was filed seeking to declare Mayor Ginther's Executive Order unconstitutional, captioned *Jason Woodland v. City of Columbus, et al*., 2:20-cv-029-ALM-KAJ. The Mayor's Executive Order was unconstitutional for the grounds alleged in the Woodland Complaint, including Counts 1 to 10, which this Complaint adopts.

161.    The same day, in response to the legal challenge to the Executive Order, Mayor Ginther rescinded the Executive Order.

162.    By their willful, wanton, and reckless acts or omissions, including but not limited

to, engaging in, authorizing, and ratifying excessive force and unlawful arrest and seizure of Plaintiff Cole Ramsey, Defendants City of Columbus, former Chief Thomas Quinlan, and John and Jane Doe 1-30, violated Plaintiff's rights by falsely arresting and imprisoning her, purportedly based on an inapplicable and unconstitutional Executive Order.

### F. Civil Action for Damages from Criminal Act

163. Plaintiffs re-allege the above paragraphs as if fully rewritten.

164. By their willful, wanton, and reckless acts or omissions constituting criminal acts, including battery prohibited by R.C. 2903.13 and the knowing interference with Plaintiffs' civil rights prohibited by R.C. 2921.45, Defendants former Chief Thomas Quinlan, Officer Matthew Houser, and John and Jane Doe 1-30 are liable under R.C. 2307.60 for injuries by conduct made criminal.

## VI. RELIEF SOUGHT

Wherefore, Plaintiffs demand judgement against the Defendants, jointly and severally, as follows:

i. Declaring that Defendant the City of Columbus, former Chief Thomas Quinlan, Officer Matthew Houser, and Officers John and Jane Doe 1-30 have violated their civil rights and/or Defendants former Chief Thomas Quinlan, Officer Matthew Houser, and Officers John and Jane Doe 1-30 have been grossly negligent toward them and inflicted injuries by conduct made criminal and/or one or more Defendants Officers battered and falsely imprisoned them;

ii. Ordering such equitable relief as will make them whole for Defendants' unlawful conduct and ensure prospectively that they are protected from future similar conduct; costs; and reasonable attorneys' fees;

iii. Awarding compensatory damages against all Defendants and against Defendants

41

former Chief Thomas Quinlan, Officer Matthew Houser, and Officers John and Jane Doe 1-30, punitive damages in excess of $25,000; and

      iv.       Granting any other relief the Court deems appropriate.

Dated: May 27, 2022                        Respectfully Submitted,

*/s/ Brian R. Noethlich*
Brian R. Noethlich (0086933)
Sanford A. Meizlish (0002620)
Jason C. Cox (0095169)
Robert E. DeRose (0055214)
**Barkan Meizlish DeRose Cox, LLP**
4200 Regent Street, Suite 210
Columbus, Ohio 43219
Phone: (614) 221-4221
Fax: (614) 744-2300
bnoethlich@barkanmeizlish.com
smeizlish@barkanmeizlish.com
jcox@barkanmeizlish.com
bderose@barkanmeizlish.com

*Attorneys for Plaintiffs*

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues and defenses triable to a jury.

*/s/ Brian R. Noethlich*
Brian R. Noethlich (0086933)